Before we get started, just a little bit of housekeeping. Since the attorneys on the first three cases are the same and the issues I think are relatively similar, instead of doing them separately, let's just do them all together. I'll give you 20 minutes per side. If it looks like we need more, I'll be flexible, but I don't expect we will. So, I don't know how that adjusts your rebuttal time. I'm not going to be super strict. We'll just hear from Mr. Gannon, Mr. Pickard, and then you on rebuttal again. If the constitutional issue comes up, we'll hear from the Justice Department. If it doesn't, I don't think we need to hear from you. We'll wait to see what he has to say. And then the case involving the solicitor's office at the end, we'll do separately and hear from the person from the solicitor's office. Any questions about that? When you're ready. Thank you. So, 10 minutes now and then 10 minutes for rebuttal? I'm sorry, 10 minutes for rebuttal total. I'm giving you 20 minutes overall instead of 15. I'm not giving you 20 minutes to go now and then extra time. Okay, I appreciate that. Five minutes for rebuttal. Again, if it looks like we need extra time and there are a lot of questions, I'm not going to be super strict today because of this last minute change, but in the interest of moving things along. I'd like to start with the 7-6-8 patent. The 7-6-8 patent is a continuation of the patents that were at issue in the CQG case and in this court's first decision in February 23rd of 2019. I'll be referring to that as IBG1. In that first decision from this court, the court found that those four patents are technological inventions that are not subject to CBM review. That's the non-presidential decision, right? Correct. Since then, we've had two presidential decisions that treat your kind of family of patents differently. In the second decision, which I'll call IBG2, this court dealt with another continuation patent, a 3-7-4 patent, that was a presidential opinion. The 7-6-8 patent at issue here is the same as, for purposes of CBM, the first group of patents in IBG1. It's different than the claims at issue in the 3-7-4 patent. Although the first decision is non-presidential, we believe that that decision, in terms of uniformity from this court, in terms of what this court has said about those inventions, is highly relevant, even though not presidential. In the 7-6-8 patent, it solves the exact same problem that was at issue with the patents in IBG1, and that is a user trading with respect to the GUI. The prices are coming in from the exchange, and the GUI had a problem. The trader had a problem with missing his or her price. That was a technical problem with the prior art displays. How is that a technical problem as opposed to a problem with how the trader processes information? It's a technical problem because the problem results from how the figure-2 style screen was constructed. It was a grid format, and information was on the grid, and information on that grid is coming from the exchange. The user has no control over that information, and so the prices are changing in these grids. But isn't that true without a grid system like yours, if the trader is getting information from some other way? It's not with respect to the 7-6-8 claims, because the 7-6-8 claims are very specifically recited to create a GUI tool that solves that problem through the claimed elements of the 7-6-8. Again, the problem in these patents, the problem with the prior art GUI, the price is flipping. The 7-6-8 claims solve that problem specifically by providing fixed order entry locations that correspond to price levels, and then continue to correspond to those price levels, even if there's a change in the market. So in other words, the way the claim is set up is that if you have a change in the market, this information is coming from the exchange, and if you have changes in the prices, the way the GUI tool is constructed, you will not miss your price, because the price corresponds to the graphical location. But isn't that just exactly what the previous two opinions described as making the trader more efficient and making the trader have better information, which those cases found ineligible, as opposed to, as an in fish, making the computer operate more efficiently? With respect to the 3-7-4 patent in IBG-2, which is, again, a continuation patent, the court found that that claim was too broad, that that claim didn't provide any display of price information, and so the court said, how could it be solving the missing the price problem, because the claim is too open-ended, where this claim is not. This claim very specifically recites the prices are displayed, you have indicators. Sure, but I don't think that's answering my question, which is not whether it's open-ended or not, but whether what you're trying to argue as a technical improvement and patent eligible is a tool that makes the trader more efficient, gives the trader better information, is a better graphical display, which seems to me to fall into the group of cases, not just in the prior two trading tech cases, but a lot of other cases from this court, interpreting Allison 101 as just different ways to display and organize data instead of an actual improvement in computer technology. Your Honor, we believe that that statement, when you have an improved software that makes the trading system better, that is an improvement in the trading system. Of course, it has benefits to the trader, just like... Let me be very specific. This claim is directed to the software that creates a new tool, a new graphical user interface that the trader interacts with. The GUI tool, the GUI is the front end of the trading system. Just like in a cockpit, the GUI that the pilot interacts with, that's part of the trading system. And so when you're improving that graphical user interface, and you're making it so that the trader doesn't miss his or her price, you're improving the trading interface. But that's not improving the functionality of the computer system. It's just improving the operator's ability to effectuate an order. The trader is provided a benefit in that the trader will get his or her price. I doubt that for a minute. I think you're absolutely right. But I don't know that that really is an improvement on or an adjustment to the actual functionality of the computer system. It just makes it easier for the trader. The software that's run on this system doesn't make the trader faster, doesn't make the trader better. The trader is just the trader. Well sure it makes the trader better because he can more accurately peg his or her price and get the stock or whatever at the price he wants rather than overpaying. But my point is it doesn't change the trader herself. Does it change the way the computer functions? It does change the way the software is constructed. It does change how the trading system operates. Yes it does. Because the GUI, the graphical user interface that the trader is interacting with is improved over the prior graphical user interface. It's no different than Core Wireless which was a graphical user interface. It was an improvement to the interface. Of course it had benefits to the user. Same thing with Data Engine, another precedential opinion. Data Engine was a GUI case where it was an improved GUI. It was an improved arrangement with tabs. Of course it made it better for the user because the user could access these spreadsheets. But the improvement was in the software. It was in the interface. But Core Wireless, it seems to me that that falls much more in line with Enfish where it was actually changing the way a database or the way a spreadsheet program works that improved the efficiency of the computer's operation rather than, again I don't mean to harp on this, improving the efficiency of the trader's decision making. So in Data Engine, just to be very clear, in Data Engine the tabs on the graphical user interface that made it so that the user could access more information, we believe that's very analogous to this situation where you have an improved graphical user interface that causes it so that the trader doesn't miss his or her price. There's no distinction between the two. But that provided a different functionality and it greatly simplified the ability to move from one page to the next. So in Data Engine, just to be clear, in Data Engine that invention, that software invention could be run on any computer. It doesn't matter what type of computer. It was the front end that made the user be able to interact with the computing system in a better way. I don't see the difference between that and having an improved interface for trading where you're making it so that the trader has benefits in speed and accuracy. In other words, when a trader goes to trade, the trader may have a trading strategy, but the invention does not. The invention all has to do with the interface, the improvement to the interface. That problem with the prior art GUI in terms of missing your price, that was found again in the IBG1 case, the four patents that issue in that case. It was found in the CQG case, that was a 101 case, where this court said that the four patents that's improved GUI is improving computer functionality. This court's already said it in the CQG case. That was a 101 case. And then in IBG1, this court looked at those findings and said, yes, that's a technical improvement to the GUI. It improves speed and accuracy. So this court has already... You continue to argue these non-presidential opinions, which are probably wrong. Wrongly decided anyway, but in any event, they're irrelevant. Your Honor, I respectfully disagree. I think a decision from this court, multiple decisions from this court, that these patents solve technical problems with technical solutions, that our client and the public should be entitled to rely on those opinions, whether they're precedential or not. Well, you can rely on opinions until they're overruled by uniformity. CQG, technological invention. IBG1, this court said the same thing. This is not a CBM. These are technological inventions. That's this court saying it twice. And the point with respect to the 768 is that if you look at the claims of the 768, they are no different than, for example, the claims of the 411 patent, which was at issue in IBG1. But since then, in two precedential decisions, we ruled a whole bunch of other of your claims to be ineligible under 101. And those precedential decisions are binding on us, and we have to figure out how to distinguish them. Exactly right, Your Honor. I agree with you that one patent in what we call IBG2, that dealt with the 374 patent. That was a continuation, just like all these other patents we're talking about in CQG and IBG1. And the court there found that those claims were just way too broad. It said more than that these are just too broad. I mean, it went in more detail about why they're not technical inventions and why they're just improving trader efficiency and not in that case. One was a direct continuation of what we're talking about, the patents at issue in CQG and IBG1. In that case, the court said, okay, does this 374 patent solve the problem of missing your price, which this court already found is a technical problem in IBG1 and in CQG. And the court said, look, I'm looking at this claim. I don't see any price information displayed. There's no indicators. There's no price information. There's no quantity. And we were asked at the hearing, how can this claim be solving the missing the price problem when you're not displaying anything on the screen? I don't mean to interrupt you, but you're a couple minutes away from your rebuttal time. Is there anything else you want to move on to, or do you want to stick with this claim? Your Honor, I think I would like to just real briefly, the 055 patent. The 055 patent is a continuation and part of the patent that we're talking about. So the base patents, again, solved this accuracy problem, speed and accuracy problem, which actually resulted in an additional technical problem. And that is that the inside market could leave the screen. And so the 055 patent is a very specific solution to that problem to keep the inside market out of the screen. So the issue that you had with the first set of patents that we were talking about is the inside market can move relative to the price axis. And the problem was the inside market could leave the screen. And so the 055 patent has a very specific solution to that. It basically says the user can adjust the number of price levels and then the computer figures out where, when the inside market gets close to the top or bottom of the screen, it issues an automatic repositioning command to keep the inside market on the screen. And that is solving a I mean, my difficulty with your argument is you keep referring to solving a problem with prior ARC GUIs as if that makes it patent eligible. But that presupposes those prior ARC GUIs themselves were patent eligible. And to the extent all they do is organize and display data, they seem to fall really right with our case law. A lot of it that says that stuff is not patent eligible under Atlas. So here's the difference, Your Honor. As this court said in CQG, the four patents that we're talking about, the four patents in the 768, this court said these inventions are not just organizing data. It's not just putting trading data on a screen. I mean, can you try to answer one of these questions without referring to one of those non-precedential opinions? Because I think you can suspect that you're not getting a lot of traction by repeatedly referencing those. The reason why these are improvements is because the claims recite a specific solution to the problems. These are classic problems with GUIs. Speed, accuracy. That's why this court found what it said. The reason why the court came down the way it did. The court said, you know, you have a problem with speed. Those are classic technical problems. And that was right. I think we have your argument. I mean, you're back to arguing those non-presidential cases. Let's hear from the other side. I'll give you the full five minutes back. Good morning. Byron Picard on behalf of the appellee. May it please the court. I would like to start with the 768 patent. Mr. Gannon mentioned this notion of a problem that was allegedly solved by the 768 patent. The so-called mispriced problem. The board has rejected that problem as being solved by the claims of the 768 patent. That is a fact finding. It did it both in the CVM eligibility issues and in the 101 issues. And we know it's a fact finding because you won't find any discussion of the mispriced problem in the 768 patent. They had to make that theory out with the extrinsic evidence of their expert, Mr. Thomas. If you look at the 768 patent, what it's really focused on, it talks in the background section about the time consuming nature of electronic trading and how 80% of it is displayed and then enters a trade. And according to the patent, that was time consuming because the earlier GUIs were not intuitive in terms of the trader appreciating how the prices were displayed. And when they went to trade, they had to do a number of keystrokes. So the 768 solves that according to the patent. And if you read the briefs, it's displaying data along an axis, showing indicators of where the inside market is, and allowing traders to execute orders with a single click. It's not about the mispriced. And we know that because the axis in the 768 patent can move at any moment. So that instant that the trader goes to send a trade order, that axis can move and he or she may miss her price. But don't take my word for it. If we look at Mr. Thomas, he described two key features that you'll see in the blue brief. This relative movement of the indicators and these so-called fixed locations. Here's what their expert, Mr. Thomas, said. This is at the appendix 8358. He was discussing the relative movement of the indicators. Quote, this movement, which provides users with an intuitive feel for the behavior of the market for the product, is not present in conventional dynamic screens. That is, that feature improves the trader. It does not improve the functioning of the computer. He continued elsewhere at 8364 in the appendix to say, also the relative movement of the indicators along the price axis allowed the trader to intuitively sense market movements. Again, we're improving the trader. And then when he discussed the fixed locations that are at the heart of solving the problem, which the board has projected, he said, the user, as a result of them, has more confidence in obtaining the desired price, even if the inside market is changing. That's at 8358. And he said that it results in a less hesitant trader. That was at 8364. All of these features are about improving the trader. This is squarely within the main theme of last month's two precedential decisions, that trading GUIs that improve the trader but don't improve the functioning of the computer are eligible for CBM review and not eligible for patenting. 768 falls squarely within that. Quickly on the 055, that's a continuation part. I think it's important to have the right context for that patent. The only thing it does is automatically recenter the axis. If we look at the second precedential decision from last month, the 556, it also built on an admitted prior art GUI and substituted profit and loss information for strict price information. The 055 is no different. Instead of showing the user a segment of the axis where the inside market is not displayed, it automatically displays information that the patentee has described as the most important information for the trader. All of this is about improving the trader, providing intuitive understanding of information. We submit that the board's decisions in all three cases ought to be affirmed for those reasons. Unless you have questions, I'll give you my time. Thank you. .